The plaintiff, administrator, alleges that plaintiff's intestate, Leary, as he is informed and believes, was employed and working in the mill of the defendant company, under its direction, as assistant engineer, on and before 18 December, 1900; that on 18 December, 1900, the said W. S. Leary was killed in the mill of the defendant company by reason of the negligence of said company, in that its machinery and belts were not safe and were in a rotten and insecure condition and unfit for the operation of the said mill; that the said mill of the defendant company was not in a safe condition and its machinery was in bad condition, unsafe and dangerous; that the same was old and secondhand, having been carried from another old mill and placed in the mill at Columbia; that the building was badly and negligently arranged, with not sufficient room for operating said machinery and repairing same, which facts were known to the defendant company; that the plaintiff's intestate, Leary, while in the employ of the defendant company and under its direction, was ordered to repair one of the belts running the machinery of the *Page 275 
said mill, which had broken, and he was required to do this work while the mill was running, which was dangerous and unsafe; that while so engaged in discharging the duties imposed upon him by his employer, to wit, "mending one of the belts," one of them broke and intestate was killed. (335)
Defendant denied that it was in any respect negligent or was guilty of any breach of duty to intestate in the premises. It alleged that plaintiff's intestate was guilty of contributory negligence. It also alleged that his intestate well knew the condition of the machinery when he entered upon the employment there, a month before his death, and assumed the risk incident thereto.
The following issues were, without objection, submitted to the jury:
1. "Was the death of plaintiff's intestate caused by the negligence of the defendant, as alleged?"
2. "Did said intestate, by his own negligence, contribute to his death?"
3. "What damage, if any, is plaintiff entitled to recover of defendant?"
There was evidence tending to show that the mill was running at night — 8 or 9 o'clock — to make up lost time, when intestate was killed; that it was in bad condition; that it could not make time without running on "and stopping often"; that it was an old, second-hand mill; that the "hog," a machine which grinds up slabs, was run by two belts, having a cylinder, with twelve knots, making 1,600 revolutions a minute, and that it was in bad condition, out of balance, had poor foundation, and was, on that account, shaking. There was evidence on the part of defendant tending to contradict this evidence.
The direct testimony in regard to the manner in which intestate came to his death comes from C. H. Leary, who testified that "On the day intestate was killed we had worked part of the time, and started up again at 7 o'clock at night to make up lost time. He was killed between 8 and 9 o'clock that night. I was upstairs, talking with the sawyer, and he said to me that one of the `hog' belts was broken, there being a belt on each side of the cylinder. I went down to repair the broken belt. I found it torn in two and took it off, putting a piece of edging between the belt and pulley. I then went down to work on the belt, but soon found that the edging which I had put in had shaken out. Had the `hog' been in place, it would not have shaken and the piece would not have come out. It came out because it was shaken so bad. Deceased was helping me to fix the belt. I (336) directed him, and had the right to direct him. He was under my direction. I sent him up to the `hog' to put the piece back. The `hog' was eight feet higher than where we were standing. He walked *Page 276 
up on the conveyor box, which conveyed sawdust to the platform. This was the only way he could get up to it without going over the conveyor box and through the belts. I did not see him after he got up. It was not more than a minute. When he got up the belt got foul around the pulley; it was slipping; it struck him on the hand. When it first got foul the sawdust was so thick I could not see him until the engine was slowed down. I saw him then, hung up in the belt that caused his death. If the engine had been shut down when he went up to repair the belt, there was no danger. There would have been no danger if the `hog' had been balanced. The pulley was badly worn — about played out; the belt was unsound and had been burned. It was two feet between where I was working and the conveyor belt."
Witness was here asked by plaintiff what was the space condition of the room where he had to work. Defendant objected to this question and to the answer to the same. Objection overruled. Witness answered: "Did not have room; if there had been more room, could have gone around." To the admission of this question and answer defendant excepted. He said, on cross-examination: "When the machinery ought to stop, it was the duty of both myself and my brother to stop it. My brother had been at the mill some little time. W. T. Campen employed us both and paid us both. The `hog' was approached by a ladder; to get to the ladder my brother had to come out underneath the belt or go through it; after he got out he could have gone up the ladder; after he got up to the pulley he would have been safer going up by the ladder which was provided by the company. If the engine had been stopped, there would have been no danger. The cause of danger was that my brother went up there when the engine was in motion. When I was there it was my duty to stop the engine. When we were at work on the pulley the safer plan was to go up by the way he went."
Plaintiff was permitted, over defendant's exception, to show (337) by one Walker that the "hog" would shake a great deal; that the mill broke down often, and that "we could seldom make a day" — the breaking of the conveyor chain was the cause of the delay; that there was no safe way to go up into this machinery while the mill was running. Witness had worked at the mill, but had not seen the "hog" for three months before the accident.
Leary was recalled, and testified that "to go around the shaft there was only twelve inches space, and that he would have to go all around the mill."
Defendant introduced W. T. Campen, who had charge of the mill. He testified, upon the question of negligence and contributory negligence, that "I instructed the hands never to repair the mill unless it was shut down. I gave this instruction to the deceased and his brother, *Page 277 
Howard Leary. . . . There was greater danger going up the way the deceased went than if he had gone up the steps which were provided by the company. Deceased had been working with the company six weeks when he was killed. The brother of the deceased said it was his own fault that he was killed." There was contradictory evidence upon this point. Witness also testified that "The mill and machinery were in as good condition as mills generally are, and were kept in good condition. No `hog' could be run for twenty hours in balance, owing to the great strain upon it, but this `hog' and machinery were in a condition usual with mills." Defendant introduced other testimony to the same effect. It was admitted that the mill belonged to defendant.
For the purpose of showing that plaintiff's intestate was not employed by it, defendant introduced W. T. Campen, who testified that in December, 1899, he was employed by the Branning Manufacturing Company to take this mill and run it. By the contract he was to keep up all repairs and do all the work. He was to receive the timber from the log cars of the Branning Manufacturing Company, cut the logs into lumber and deliver it to the Branning Manufacturing Company, thus manufactured, for shipment on its cars, for which the Branning company was to pay him $1.75 per thousand feet. "We were to give each other thirty days' notice before either could give up the contract I took charge on 15 January. Later, and before the accident, I became dissatisfied with the contract and gave notice that I would quit, (338) whereupon Mr. Branning, president of the company, had an interview with me and told me he would pay me what I could make, and he indemnified me that I should make $150 per month. Under the contract I was to have entire charge of the mill; I was to hire the hands and to discharge them, and no one else had anything to do with them. I remained in charge two years and one month. If I made more than $150 per month, which he guaranteed, at $1.75 per thousand, I was to have it. . . . I kept no office and kept no books. I made out the pay rolls and sent them to Edenton, and the money was charged to me. The Branning company employed an inspector to keep the amount of lumber I cut. This was agreed upon when I made the bargain, and this was the only person about the mill that the Branning company hired or paid. It was also agreed, when the contract was made, that the Branning company should keep the books and should furnish the cash for the purpose of paying the hands upon the pay rolls furnished by me. This was done because I had no facilities for bookkeeping and because there were no banks in Columbia from which I could get money. There was some trading done by my laborers at the store of the Branning Manufacturing Company. This credit was given them at my request. Statements were sent to me and I was responsible to the amount of the *Page 278 
wages due the hands. The amounts so advanced were charged to me on the books. The company agreed to pay me five per cent of the net profits for the trade of my men at their store. This agreement was not made until after the guarantee by the Branning company, referred to the above. I hired intestate, paid him and directed him, and no one but me had the right to discharge him. I would not have kept a man as assistant engineer who was disagreeable to the chief, and would have dismissed him upon complaint of the chief, but he could not be removed without my consent. My name did not appear upon the pay roll at all — only the hands employed by me. Bills for material furnished the mill and for repairs upon the mill were charged against me, and I would send them to the Branning company, which would put them to my account. That company had nothing to do with the work, except to give me any special sizes they would want to cut. Generally the (339) timber was cut in sixteen and twelve-foot lengths, but if defendant wanted a special bill I would cut them for it."
This testimony was corroborated by Horton Corwin, Jr., president of defendant company. Plaintiff's witness, Walker, upon this branch of the case, testified that while he was employed at the mill (in 1900) he saw Mr. Branning come to the mill often. "He would talk with Campen; were walking around the plant together once or twice a month." There was other evidence to the same effect. Defendant owned a plant in Edenton, N.C. The mill in which plaintiff's intestate was employed was located at Columbia, N.C. The lumber cut there belonged to defendant; it was shipped to Edenton.
Defendant, at the appropriate stages of the trial, moved for judgment of nonsuit, which was refused, and defendant excepted. Defendant made a number of requests for special instructions, which are noticed in the opinion. The instructions given, to which exceptions are taken, are noted and discussed in the opinion. There was a verdict for the plaintiff upon both issues, and damages assessed at $2,000. Motion for new trial; motion denied. Exception. Judgment upon the verdict. Defendant assigned errors and appealed.
No issue being tendered in regard to the alleged assumption of risk by plaintiff's intestate, that defense is eliminated from the case. We presume that the learned counsel treated that phase of the case as involved in the issue directed to the alleged contributory negligence of plaintiff's intestate. We have set out the *Page 279 
testimony at some length, because the requests for special instructions and the exceptions to the instructions given present every possible question which could arise upon the record. We will first dispose of the exceptions to his Honor's admission of testimony. The first is directed to the answer given by the witness as to the "space condition," etc. It will be observed that the answer is not responsive to the question. He was not asked for an opinion or conclusion, but for a fact. If his Honor had been so requested, he would doubtless have stricken (340) out the answer and directed the witness to give one responsive to the question. This the witness did later on by saying that "there was only twelve-inch space to go around the shaft." While the first answer may have been, and probably was, subject to the criticism made by defendant, it was, in the light of the subsequent answer, giving the fact upon which the jury were enabled to draw their own conclusion, not prejudicial to defendant — certainly not sufficiently so to call for a new trial. It is frequently difficult to draw the line between testimony which is a statement of fact and that which is a conclusion of the witness. The testimony upon which the next two exceptions are based is, at the most, irrelevant and harmless. The exception to the testimony of Waters, in regard to the condition of the mill three months before the death of plaintiff's intestate, is not referred to in the brief and is to be treated as abandoned. The motion for judgment of nonsuit was properly denied.
The contention of the defendant in regard to the question of Campen's being an independent contractor, which, as said by his Honor to the jury, lay at the threshold of the case, is presented by the prayer for an instruction that, "Upon all of the evidence in this case, the jury shall find that Campen was an independent contractor; that defendant owed no duty to the intestate, and they shall answer the first issue `No.'" This his Honor declined, but said to the jury "that this would be the first inquiry, and if they found that Campen was an independent contractor, that ends the case." He further instructed the jury: "It is contended by the defendant that it had contracted its mill to Campen. It is accepted law that where a contract is for something that may be lawfully done and is proper in its terms, and there has been no negligence in selecting a suitable person to contract with, in respect to it, and no general control is reserved, either in respect to the manner of doing the work or the agents to be employed in doing it, and the person for whom the work is done is interested only in the ultimate result of the work and not in several steps as to progress, the latter is not liable to a third person for the negligence of the contractor, but liability of the superior master depends upon his right to control the conduct of the person with whom he contracts in the prosecution of the work. *Page 280 
(341) If you find from the evidence that Campen leased the mill of the Branning Manufacturing Company under contract, that he was to employ the labor and bear all the expense of running the mill, was to receive the logs of the company from the trucks, manufacture the same into timber and deliver it aboard cars for shipment, at $1.75 per thousand feet, with guarantee that he should make as much as $150 per month, and that it did not retain the right to control the conduct of Campen and was interested only in the ultimate result of the work, then the defendant is not liable, and you will answer the first issue `No.' But if you find from the evidence that there was a general control of the operation of the mill reserved by the defendant company in respect to the general operation of the mill, then go further and consider the question of negligence raised."
To these instructions defendant excepted. We think that the charge is in accordance with the decisions of this Court. The language used by his Honor in defining an independent contractor is identical with that of Walker, J., in Craft v. Lumber Co., 132 N.C. 151, quoted with approval in Young v. Lumber Co., 147 N.C. 26. If his Honor correctly declined the instruction, which practically took the question from the jury, there can be no valid criticism of the charge given. Plaintiff suggests that the burden of showing that Campen was an independent contractor was on the defendant. The burden was upon the plaintiff to show that his intestate was in the employment of defendant. It would seem that when he showed that the mill was the property of the defendant corporation, that at the time of his employment it was being operated in sawing the logs of the defendant, and that the sawed lumber was shipped to defendant at Edenton, near by, where it was operating a plant, plaintiff was entitled to go to the jury on the issue. "Where the plaintiff has suffered an injury from the negligent management of a vehicle, such as a boat, car or carriage, it is sufficient prima facie
evidence that the negligence was imputable to the defendant to show that he was the owner of the thing, without proving affirmatively that the person in charge was the defendant's servant. It lies with the defendant to show that the person in charge was not his servant, leaving him to show, if he can, that the property was not under his (342) control at the time, and that the accident was occasioned by the fault of a stranger, an independent contractor or other person, for whose negligence the owner would not be answerable." 1 Sher. and Red. Neg., 71. Any other rule, especially where persons are dealing with corporations, which can act only through agents and servants, would render it almost impossible for a plaintiff to recover for injuries sustained by defective machinery or negligent use of machinery. The plaintiff's intestate may be taken to have known that the mill was the *Page 281 
property of defendant — that it was being used for the purpose of sawing defendant's logs. One witness said that "defendant owned much timber on this side of the sound and a railroad." Campen said: "There was some trading done by my laborers at the store of the Branning Manufacturing Company." All of this was well calculated to cause intestate to suppose that Campen was operating the mill for defendant company, and, in the absence of any testimony to the contrary, would be sufficient to carry the case to the jury and sustain a verdict. Without entering into the debatable domain of the burden of proof it is sufficient to say that, at least in this case, the plaintiff had put upon defendant the duty of "going forward" or "persuading" the jury that Campen was not operating the mill for the owner, but as an independent contractor. The instruction asked by defendant involves the proposition that, taking all of the evidence as true, it has shown as a matter of law that Campen was an independent contractor. An examination of the authorities and decided cases discloses much confusion and uncertainty in respect to what constitutes an independent contractor. The question underwent an exhaustive discussion in Wiswall v. Brinson, 32 N.C. 554, in whichPearson, J., and Ruffin, C. J., differed in opinion. These opinions are "mines of learning" and "arsenals of argument." Pearson, J., begins the discussion by saying that "the question is one of serious difficulty," and that the cases "are numerous," that "many of them turn upon nice distinctions." He states the fundamental principles, that "One should so use his own as not to injure another," and "That which you do by another, you do by yourself." And from these two maxims he says: "The general rule results where one procures work to be done, if a third person is injured by the negligence or want of skill of the person employed, the person for whose benefit and at whose instance (343) the work is done must make compensation. . . . The rule is founded upon justice, and exceptions to it should be allowed with caution, and only to the extent called for by public convenience." He then proceeds to discuss the recognized exceptions, as established by decided cases. We would not undertake to add anything to the discussion in the opinion, concurred in by Nash, J., and the dissenting opinion of Ruffin, C. J. It is conceded that where the person employed to do work carries on an independent employment and does the work in his own way, by his own means, and free from the right of control by the person for whom the work is done, he is an independent contractor. This exception is based upon public convenience and sound policy. It is said: "The true test, as it seems to us, by which to determine whether one who renders service to another does so as a contractor or not, is to ascertain whether he renders the service in the course of an independent occupation, representing the will of his employer only as to the *Page 282 
result of his work, and not as to the means by which it is accomplished." Such was the leading case of Milligan v. Wedge, 12 Adol. E., 737, cited by Sharpenstein, J., in Bennett v. Truebody, 66 Cal. 509. There the injury was caused by the negligence of a plumber, who "exercised an independent and distinct employment." It was held that the owner of the premises was not liable. In Hexamer v. Webb, 101 N.Y. 377, the party employed was engaged in the "roofing and cornice business."Coal Co. v. McEnery, 27 Conn. 274. It would seem that where the person employed to do the work in his own way, and free from the control of the employer, is engaged in an independent calling, it is but just that persons who contract with him, either as employees or otherwise, should look to him for compensation. We do not mean to say that the exception is confined to work done by one engaged in an independent calling. It is certainly much more difficult to fix the limits of the exception when this element is absent. In Waters v. Fuel Co., 52 Minn. 474, the employee of defendant was engaged in delivering coal at a stipulated price per load: Held, that he was the servant of the company. The Court said: "It is not easy to frame a definition of the (344) term `independent contractor,' that will satisfactorily meet the conditions of different cases as they arise, as each case must depend so largely upon its own facts." Speed v. R. R., 71 Mo., 303, was an action for personal injuries sustained by plaintiff while engaged in unloading a car belonging to defendant. It appeared that the defendant had entered into an agreement with one Merry, by which he was to take entire charge and control of the business of loading and unloading freight to and from its cars at St. Louis station. By the terms of the agreement Merry was to have authority and control over the grounds, yards and building at the station, including engines and cars, to enable him to properly discharge his duties under the agreement. Merry was to be paid fifteen cents per ton for each ton shipped to or from the yard. All the business was to be transacted by Merry in a manner satisfactory to the superintendent of defendant and subject to his control. Plaintiff was employed by Merry and was injured while in such employment. Defendant set up the defense that Merry was an independent contractor.Henry, J., said: "There is an irreconcilable conflict in the adjudications upon this subject. The general principle is recognized everywhere, that one is only liable for damages occasioned by the act of another when he stands in the relation of master to that other. It is an easy matter to state the general principle, but it is often extremely difficult to determine, from the facts in a given case, whether the relation of master and servant exists." It was held in that case that the relation existed and defendant company was liable. The value of the decision is weakened by the fact that the court attached importance to the character of *Page 283 
the business in which defendant was engaged — a common carrier. Probably all that can be done, after an examination of the decided cases, is to adopt the conclusion of Judge Bailey, that "There is much confusion in the authorities, and much depends on the exact conditions of the employment and particular circumstances attending each case. The mere fact that one works by the piece or job, and not by the day or week, is not a conclusive test of the character of the employee, whether a servant or an independent contractor." Personal Injuries, 470.
The plaintiff having shown conditions entitling him to go to the jury, it became the duty of defendant to show or at least to introduce evidence to repel the plaintiff's proof. The truth of the testimony, together with the reasonable inferences to be drawn therefrom, (345) was for the jury. There was much in the testimony to justify them in rejecting the defendant's contention. As we have pointed out, the mill belonged to defendant; the logs being cut were its property; the hands were paid by orders on the defendant; some of them traded at defendant's store; the defendant kept an inspector at the mill to take an account of the lumber; the defendant guaranteed that Campen should make at least $150 per month; the contract was for no definite time. There is no suggestion that Campen carried on any independent employment. Mr. Branning came to the mill often. It is true that defendant's testimony was to the effect that the company had nothing to do with the work, except to give special sizes it wanted cut, and tended to explain many of the circumstances and conditions relied upon by plaintiff. It is significant that Campen uses the expression that he was employed by the Branning Manufacturing Company to take the mill and run it. In Young v. Lumber Co., supra, the contract under which the logs were cut in the woods was in writing. We held that his Honor erroneously submitted the question as to its legal signification to the jury, but held that he should have submitted the question whether the contractor was cutting the logs in good faith under the contract. Merely calling a man an independent contract, operate a secondhand mill, in bad repair, dangerous to employees, for the purpose of having its logs cut into lumber, and escape liability for injuries sustained by the employees, who, in good faith and upon reasonable grounds, supposed that they were employed by and were working for the owner of the mill. Such an exception to the general rule stated byPearson, J., in Wiswall v. Brinson, supra, would not be founded upon public convenience or sound policy. In Davis v. Summerfield,133 N.C. 325, we held that where the character of the work to be done was *Page 284 
essentially dangerous, the duty to use due care could not be delegated to an independent contractor by the owner of the property. We also discussed the question in Young's case, supra. This is a recognized exception to the rule. How far this exception to the nonliability of the owner of the property is applicable to a case like this we do not (346) undertake to say. It is well worthy of consideration whether the owner of machinery, unsafe for use and dangerous to employees, can, by contracting with an insolvent person to operate it to do the owner's work, and by simply surrendering control of the manner of doing the work, avoid liability for injuries sustained by employees. It may be that liability would be based upon a different legal foundation — falling within the domain of tort, rather than breach of contract. R.R. v. Madden, 77 Kan. 80.
Upon the question of negligence the court instructed the jury: "In order to establish actionable negligence it is necessary for the plaintiff to show to the jury, by the greater weight of evidence, that there has been a failure by the defendant in the exercise of reasonable care to discharge some duty which it owed the plaintiff, under the circumstances, in which they were placed, reasonable care being that care which a prudent man would exercise under similar circumstances, when surrounded by like conditions; and not only this, but he must also show that such failure of duty was the proximate cause of the result, proximate cause being that which produces the result in a continuous sequence and one without which the accident would not have happened, and one which a man of ordinary prudence could foresee that such result would likely happen. It is the law in North Carolina that an employer of labor to assist in the operation of mills — plants — where the machinery is more or less complicated is required to provide his employees, in the exercise of reasonable care, a reasonably safe place to work, and to supply them with machinery reasonably safe and suitable, and he is also required to keep such machinery in such condition, as far as can be done in the exercise of reasonable care and diligence."
We perceive no error in this instruction. It is in accordance with the decisions of this Court and the well-settled principles of the law prescribing the duty of employers to their employees. The record states that his Honor charged the jury in respect to fellow-servants, to which there was no exception, other than his refusal to instruct the jury, as requested, that intestate and his brother, Howard Leary, were fellow-servants. This, in the light of the testimony of Howard, "I directed him and had a right to direct him; he was under my direction; (347) I sent him up to the `hog' to put the piece back," he could not have given. Defendant asked a number of instructions upon the second issue, some of which embodied correct propositions of law. *Page 285 
Some of them could not have been given as asked, because they practically took the question from the jury. His Honor instructed the jury upon this issue: "While the law imposes a duty upon the master, it also imposes a correlative duty upon the servant. It requires him to exercise ordinary care for his own safety, to use his intelligence and his senses, and it holds him responsible if he is injured by his failure to exercise such care. It requires him to observe the machinery at which he is working and the appliances used to discover those dangers which a man of ordinary prudence would discover; and if he fails to perform his duty and is injured thereby, he can not recover damages, for while the plaintiff assumes the risk incident to the working in the mill, he did not assume the risk resulting from defective machinery or from defective place or appliances to do his work; and if the plaintiff knew of the danger of the machinery when he went up to fix the `hog,' and if in consequence thereof the danger to himself was so obvious that any man of ordinary prudence would not have gone up the way plaintiff went, then the plaintiff would be guilty of contributory negligence, and you should answer the second issue `Yes.' If, however, the plaintiff was not guilty of contributory negligence, you will answer this issue `No.' If there was a safe way to go to the `hog' provided by the company, which intestate knew or ought to have known, and he chose another way, which was unsafe, and this was the proximate cause of the hurt, the jury shall answer the second issue `Yes.' That if the jury shall find that it was clear in the mind of one of ordinary intelligence that it was dangerous to go into the machinery as deceased did, and that the danger was obvious and imminent, and, notwithstanding, undertook to do so, and his doing so was the proximate cause of his hurt, the jury will answer the second issue `Yes.'"
These instructions are correct in themselves and, we think, present every phase of the controversy. The exception to the refusal to dismiss the case because not brought in one year was not pressed (348) in this Court. It is settled by Meekins v. R. R., 131 N.C. 1.
We have examined the entire record, in the light of the exceptions made to his Honor's rulings and the briefs of counsel. The case was carefully tried and fairly submitted to the jury. The evidence, while in some respects conflicting, sustains the plaintiff's contention that the machinery was in bad condition, unsafe, and certainly dangerous when being operated at night. There is
No error.
Cited: Thomas v. Lumber Co., 153 N.C. 355; Harwell v. Lumber Co.,154 N.C. 263; Denny v. Burlington, 155 N.C. 37; Sutton v. Lyons,156 N.C. 5; Embler v. Lumber Co., 167 N.C. 460. *Page 286